FULGHUM v UNITED PARCEL SERVICE, INC

Docket No. 73092. Argued June 5, 1985 (Calendar No. 23).—Decided December 10, 1985.

Cleo R. Fulghum and Robert T. Morin brought an action in the Wayne Circuit Court against their employer, United Parcel Service, Inc., and Edward Mastay and Marvin Shevrovich, employees of UPS, seeking damages for defamation, invasion of privacy, and intentional infliction of emotional distress arising from an accusation by the UPS employees in the course of their employment of theft by the plaintiffs and from their eventual discharge by UPS following grievance proceedings. The court, William J. Giovan, J., granted defendant's motion for summary judgment. The Court of Appeals, T. M. BURNS, P.J., and R. M. MAHER and CYNAR, JJ., affirmed as to UPS and Shevrovich, stating that the grievance procedure comported with elementary fairness and that the plaintiffs thus were bound by the factual determinations of the grievance tribunals, and as to Mastay on the ground of collateral estoppel (Docket No. 64520). The plaintiffs appeal.

In an opinion by Justice BOYLE, joined by Justices RYAN, BRICKLEY, CAVANAGH, and RILEY, the Supreme Court *held*:

Where, as in this case, a collective bargaining agreement provides a method for dispute resolution and a dispute is not of constitutional magnitude and does not involve statutory construction, but rather involves a question of fact, deference should be accorded the method provided by the agreement. The decision of a joint management-labor grievance committee, as designated by the collective bargaining agreement in this case

REFERENCES FOR POINTS IN HEADNOTES

[1] Am Jur 2d, Labor and Labor Relations §§ 1838 *et seq.*
Enforcement of contractual arbitration clause as affected by expiration of contract prior to demand for arbitration. 5 ALR3d 1008.

[2, 3] Am Jur 2d, Labor and Labor Relations §§ 1895-1897.
See the annotations in the ALR3d/4th Quick Index under Discharge From Employment.

[4, 5] Am Jur 2d, Libel and Slander §§ 114-116.
Privileged nature of communications to other employees or employees' union of reason for plantiff's discharge. 60 ALR3d 1080.

for dispute resolution, is to be given the same deference as a decision of an independent arbitrator.

Affirmed.

Justice Levin, joined by Chief Justice Williams, wrote separately that the determination of an independent arbitrator or a joint management-union grievance committee that a discharged employee was guilty of misconduct and that there was cause for discharge bars an action by the employee against the employer denying misconduct and alleging wrongful conduct by the employer incidental to and directly related to the discharge, because the question of misconduct was decided adversely to the employee and may not be litigated in another forum.

1. Even if the tort of intentional infliction of emotional distress were recognized in Michigan, the defendants could not maintain such an action where their employer did no more than inform them of its belief that they had stolen property and, on that basis, suspended and later discharged them. A discharge ordinarily involves a communication to an employee by the employer of the reason for discharge, and an employer may not be subjected to liability for mental distress damages for such communication. In this case, the "just cause" for the plaintiffs' discharge was determined during binding grievance proceedings conducted pursuant to a collective bargaining agreement. Permitting the plaintiffs to bring an action for mental distress damages on the ground that accusations of dishonesty made during the grievance proceedings were false, would be tantamount to allowing the plaintiffs to obtain a redetermination of their allegation of wrongful discharge in a different forum.

2. Likewise, the accusations of dishonesty cannot provide a basis for a common-law action for defamation. Communications made in the course of, or in connection with, grievance or arbitration proceedings provided for by a collective bargaining agreement are absolutely privileged under the law of defamation. The accusation that the plaintiffs were discharged because of theft was necessarily repeated during the grievance proceedings. A determination whether the plaintiffs had been discharged for just cause could not have been made without considering the employer's reasons for the discharge.

3. An employer is not privileged to communicate needlessly to the world at large, including to fellow employees, the reasons for an employee's discharge if it is of a character that would hold the discharged employee up to opprobrium. An employer has a qualified privilege to publish true statements to other employees whose duties interest them in the subject of the employee's dismissal. Employers have an interest in informing

employees that discharge is the penalty for certain wrongdoings, and employees have an interest in knowing how the disciplinary process works. Where a discharged employee invokes a grievance procedure provided in a collective bargaining agreement, the determination of an arbitrator or a joint management-union grievance committee that the discharge was for just cause establishes the defense of truth to allegations of defamation premised on statements explaining the reasons offered for the discharge. Permitting litigation of the truth of such statements would also be tantamount to permitting redetermination.

130 Mich App 375; 343 NW2d 559 (1983) affirmed.

### OPINION OF THE COURT

1. LABOR RELATIONS — GRIEVANCE PROCEEDINGS — COLLECTIVE BARGAINING.

A method for dispute resolution provided in a collective bargaining agreement should be accorded deference where the dispute is not of constitutional magnitude and does not involve statutory interpretation, but rather involves a question of fact; where the method prescribed includes decision by a joint management-labor grievance committee, such decision is to be given the same deference as a decision of an independent arbitrator.

### OPINION BY LEVIN, J.

2. LABOR RELATIONS — GRIEVANCE PROCEEDINGS — COLLECTIVE BARGAINING — WRONGFUL DISCHARGE.

*Determination by an independent arbitrator or a joint management-union grievance committee that an employee was guilty of misconduct and, under a collective bargaining agreement, was discharged for cause bars an action in tort by the employee against the employer denying misconduct and alleging wrongful conduct by the employer incidental and directly related to the discharge, because the question of misconduct was decided adversely to the employee and may not be litigated in another forum.*

3. LABOR RELATIONS — MENTAL DISTRESS — DISCHARGE.

*The discharge of an employee ordinarily involves a communication by the employer to the employee of the reason for discharge, and the employer may not be subjected to liability for mental distress damages for such communication.*

4. LABOR RELATIONS — GRIEVANCE PROCEEDINGS — COLLECTIVE BARGAINING — DEFAMATION.

*Accusations of dishonesty by an employer made during grievance*

*proceedings regarding the discharge of an employee cannot provide a basis for an action for defamation; communications made in the course of or in connection with grievance or arbitration proceedings provided by a collective bargaining agreement are absolutely privileged under the law of defamation.*

5. LABOR RELATIONS — GRIEVANCE PROCEEDINGS — COLLECTIVE BARGAINING — DEFAMATION.

*An employer is not privileged to communicate needlessly to the world at large, including to fellow employees, the reasons for an employee's discharge if it is of a character that would hold the discharged employee up to opprobrium; an employer has a qualified privilege to publish true statements to other employees whose duties interest them in the subject of the employee's dismissal; where a discharged employee invokes a grievance procedure provided in a collective bargaining agreement, the determination of an arbitrator or a joint management-union grievance committee that the discharge was for just cause establishes the defense of truth to allegations of defamation premised on statements explaining the reasons offered for the discharge.*

*Kelman, Loria, Downing, Schneider & Simpson* (by *Michael L. Pitt*); (*Barbara Harvey,* of counsel) for the plaintiffs.

*Butzel, Long, Gust, Klein & Van Zile* (by *William M. Saxton* and *Keefe A. Brooks*) for the defendants.

Amicus Curiae:

Public Citizen Litigation Group (by *Arthur L. Fox, II,* and *Paul Alan Levy*) and *Barbara Harvey* for Association for Union Democracy.

BOYLE, J. We agree with the result suggested by the minority, but for the reasons stated by the Court of Appeals in its disposition of this case.

Where a collective-bargaining agreement provides a method by which disputes are to be resolved, there is a strong policy in favor of deference to that method of resolution. *Hines v Anchor*

*Motor Freight, Inc,* 424 US 554; 96 S Ct 1048; 47 L Ed 2d 231 (1976). This policy can only be effectuated "if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." *United Steelworkers of America v American Mfg Co,* 363 US 564, 566; 80 S Ct 1343; 4 L Ed 2d 1403 (1960). Indeed, the United States Supreme Court has held that the decisions of joint management-labor grievance committees, such as was employed in this case, are entitled to the same deference as the decisions of independent arbitrators. *General Drivers, Warehousemen & Helpers, Local Union No 89 v Riss & Co, Inc,* 372 US 517; 83 S Ct 789; 9 L Ed 2d 918 (1963).

Although the Supreme Court recognized an exception to the rule of finality in the context of a Title VII employment discrimination claim in *Alexander v Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974), it has no application to this case. Here, the finding of the grievance committees that plaintiffs seek to avoid is not one of constitutional magnitude or statutory construction; rather, it is a simple question of fact clearly within the competence of the grievance committees. See, also, *Ivery v United States,* 686 F2d 410 (CA 6, 1982), especially Jones, J., *concurring.* [130 Mich App 375, 377-378; 343 NW2d 559 (1983).]

Affirmed.

RYAN, BRICKLEY, CAVANAGH, and RILEY, JJ., concurred with BOYLE, J.

LEVIN, J. Plaintiffs Cleo Fulghum and Robert Morin, employees of defendant United Parcel Service, Inc., were suspended and later discharged after defendants Ed Mastay and Marvin Shevrovich, other employees of UPS, accused them of stealing a small quantity of homemade sausage sent to UPS for shipping. Fulghum and Morin were members of Local 243 of the Teamsters Union.

Pursuant to the collective bargaining agree-

ment,[1] Fulghum and Morin filed grievances against UPS. At both the local level and on appeal to the state committee, consisting of UPS and union representatives, the representatives deadlocked. The agreement provided that a discharge was deemed to be upheld in the event of deadlock. A further appeal was taken to the UPS joint-area committee in Chicago. The joint-area committee reached a decision, denied the grievances, and sustained the discharges.

The parties agree that Fulghum's and Morin's grievances were properly submitted under the grievance procedure provided in the agreement and that the decision reached in Chicago is final and binding on the issue whether their discharge was for "cause."

Fulghum and Morin then filed this action in circuit court against their former employer, UPS, and Mastay and Shevrovich. The complaint stated three counts; the first and third counts were based on statements made at the time of, and following, the suspension of Fulghum and Morin, accusing them of dishonesty. In the first count, Fulghum and Morin claimed that Mastay and Shevrovich, in

---

[1] Article 5 of the supplemental agreement to the National Master Panel Service Agreement, provides in relevant part:

"A grievance is hereby jointly defined to be any controversy, complaint, misunderstanding, or dispute arising as to interpretation, application or observance of any of the provisions of this Agreement or any Supplement or Rider hereto.

\* \* \*

"In the event of any grievance, complaint, or dispute on the part of any employer, it shall be handled in the following manner, and *a decision reached at any stage shall be final and binding on both parties.* (Emphasis supplied.)

\* \* \*

"(c) If the parties fail to reach a decision or agree upon a settlement in the matter, it shall be submitted to the State Committee or UPS Joint Area Committee, whichever is applicable within fifteen (15) days. Any cases not resolved at the state level should then be submitted to the UPS Joint Area Committee within fifteen (15) days.

the course and scope of their employment with
UPS, falsely accused Fulghum and Morin of steal-
ing "and/or" misappropriating merchandise be-
longing to UPS or one of its customers and that the
statements were subsequently repeated to other
persons. Further, written documents were pre-
pared by UPS, publishing such false statements.
The second count, for invasion of privacy arising
from the surveillance and filming of Fulghum and
Morin's work activity, was subsequently with-
drawn. The third count alleges intentional inflic-
tion of emotional distress resulting from the
wrongful accusation and discharge of Fulghum
and Morin.

Extensive discovery depositions were taken, and
on that basis the circuit court granted defendants'
motion for summary judgment. The Court of Ap-
peals affirmed,[2] stating that "[d]efendants UPS and
Shevrovich were granted summary judgment be-
cause the grievance process comported with 'ele-
mentary fairness'; therefore, plaintiffs were bound
by the factual determinations made by the griev-
ance tribunals. Defendant Mastay was granted
summary judgment on the basis of collateral estop-
pel."

Fulghum and Morin do not claim that UPS
breached the collective bargaining agreement; nor
do they claim that the union violated its duty of
fair representation. They claim rather that the
decision of the UPS joint-area committee affirming
their discharge does not bar their common-law
claims for defamation and intentional infliction of
emotional distress. They rely on *Alexander v*

---

[2] *Fulghum v United Parcel Service, Inc,* 130 Mich App 375; 343
NW2d 559 (1983).

Mastay suspended Fulghum and Morin; Shevrovich conducted the
surveillance. Mastay and Shevrovich testified at the local and state
hearings; only Shevrovich appeared before the UPS joint-area commit-
tee.

*Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L
Ed 2d 147 (1974), and assert that the policy consid-
erations that justify a dual remedy for violation of
a statutory right should also govern when a com-
mon-law right is involved. Second, they assert
that, in the absence of mutuality of estoppel, the
decision of the joint-area committee cannot pre-
clude litigation of the issues in the instant action.
Third, even if the mutuality of estoppel require-
ment is satisfied, they contend that the findings of
the joint-area committee do not preclude the
claims for defamation and intentional infliction of
emotional distress because Fulghum and Morin
were not accorded minimal due process in the
grievance proceedings.

The defendants contend that the summary judg-
ment should be affirmed because of the preclusive
effect of the grievance determination. They also
argue that since the allegedly defamatory state-
ments were made solely within the scope of Mas-
tay and Shevrovich's employment, and were made
leading up to and within the context of grievance
proceedings, the statements are absolutely privi-
leged as a matter of federal labor law. The state-
ments complained of relate to the charges of dis-
honesty which were the basis of the suspensions
and discharges and the grievance filed pursuant to
the collective bargaining agreement.

I

Fulghum and Morin allege that the accusations
of dishonesty made at the time they were sus-
pended and their wrongful discharge constitute
"outrageous" behavior sufficient to support a cause
of action for the intentional infliction of emotional
distress. Assuming, without deciding, that the tort
of intentional infliction of emotional distress is

recognized in this state,[3] Fulghum and Morin cannot maintain such a claim on evidence that their employer did no more than inform them of its belief that they had stolen property and, on that basis, they were suspended and later discharged. There is no evidence that UPS, Mastay, or Shevrovich held Fulghum and Morin up to obloquy in a manner such as to bring them within the scope of the tort of intentional infliction of emotional distress. On the basis of Fulghum's and Morin's deposition testimony, it appears that the accusations related solely to the reason for the discharge, albeit a reason accusing them of dishonesty and theft and locker room language was used.[4]

---

[3] See *Roberts v Auto-Owners Ins Co,* 422 Mich 594; 374 NW2d 905 (1985).

[4] Morin testified on deposition that Ed Mastay said to him upon entering the security office, "Where is the sausage? . . . I am not going to fuck around with you, Bob Morin. Where is that God damn sausage?" To which Morin replied, "I told him if he could find any sausage on me that I would take him downtown and kiss his ass on the City Hall stairs." The gist of the discussion in the office was that the employee had "messed up"—the use of the "f-word" does not justify a finding that this conduct was "outrageous."

Fulghum testified on deposition to the following exchange when he went to Mastay's office:

"*Q.* What did Mastay say to you during that meeting?

"*A.* 'Where is the sausage?' I said, 'What sausage?'—'You know what the hell I am talking about. Where is the sausage you took home last night, Cleo? You took 35 pounds of sausage out of here.' I said, 'Man, I don't know what you are talking about.'

* * *

"*A.* He said, 'Is this the box you took the sausage out of?' He threw the box on the table. I said, 'No.' So the union steward started to say something and he said, 'You just shut up. Fuck off.' So she finally got things quieted down and told him, 'Hey, I am here to represent the man. You don't tell me to shut up. I am trying to defend this man. I am trying to get this in order.' He said, 'Well, the hell with you.' So then he got back to me and he said, 'This carton here, is the carton you took the sausage out of. You took the sausage home.' I said, 'Hey, man, I don't know what you are talking about.' He said, 'You took 35 pounds of sausage out of here. This is the box. Right?' I said, 'No. I don't know what you are talking about, man.' So it went on back and forth. And he started cursing Kathy like she was not a lady, like she was not trying to represent anybody. He went wild. Finally he said, 'To hell with it. I am terminating Cleo until further investigation.'

A discharge ordinarily involves a communication to the employee of the reason for discharge. If an employer who explains the basis of discharge were subject to an action for mental distress damages on the basis of the explanation, every employee asserting wrongful discharge might claim that the reason or cause stated by the employer is untrue and seek, on that basis, mental distress damages.

Fulghum and Morin have job security only because of the provision in the collective bargaining agreement providing that they may not be discharged except for "just cause." The question of "cause" for discharge has been decided in the final and binding grievance proceedings conducted pursuant to the collective bargaining agreement. To permit plaintiffs to maintain an action for intentional infliction of mental distress on the basis of the allegation that the accusations were false would be tantamount to allowing them to bring in a different form and forum, a claim for wrongful discharge.

## II

Fulghum and Morin's count in defamation has two components: 1) statements made in the course of and during the grievance procedure, and 2) communications to co-workers.

We hold that accusations of dishonesty made during grievance proceedings provided for in the collective bargaining agreement cannot be the basis of a common-law action for defamation. Federal and state courts have uniformly held that communications made in the course of, or in con-

"*Q.* Did you say anything during this meeting other than what you told me?

"*A.* He just insisted I took some sausage. I said no."

nection with, grievance or arbitration proceedings provided for by a collective bargaining agreement, are, at least in some degree, privileged under the law of defamation.[5]

Defendants argue that as a matter of federal law the statements are absolutely privileged. In a leading case from the United States Court of Appeals for the Tenth Circuit, *General Motors Corp v Mendicki,* 367 F2d 66 (CA 10, 1966), the plaintiff was discharged for misappropriation of company property. The alleged slanderous statement was made by a General Motors representative at a grievance meeting between GM and the union. The court held that the statements complained of were protected by an absolute privilege:

> We think Congress intended that the respective representatives of employer and employee at such conferences and bargaining sessions should feel free to express their respective contentions as to the pertinent facts and the issues involved fully and frankly and to strongly support their positions with respect to the controversy . . . "untrammelled by fear of retribution . . . ." Moreover, such actions . . . would tend to impair the chance

[5] Anno: *Libel and slander: Privileged nature of communications made in course of grievance or arbitration procedure provided for by collective bargaining agreement,* 60 ALR3d 1041.

The annotation discusses different bases for finding a privilege: 1) the collective bargaining agreement gives rise to a privilege as to communications made pursuant to its provisions; 2) the mutual interest or duty of the parties; 3) the duty of the publisher to communicate; 4) the federal or state labor policy which favors settlement of labor grievances through bargained upon processes. Other courts have found that the communication is absolutely privileged because the employee, in effect, consented to the publication at a meeting between management and union officials since the union representative was acting as the employee's agent. See, *e.g., Brockman v Detroit Diesel Allison Div,* 174 Ind App 240; 366 NE2d 1201 (1977).

See also Anno: *Libel and slander: Privileged nature of communication to other employees or employees' union of reasons for plaintiff's discharge,* 60 ALR3d 1080.

for   a   peaceful   settlement   of   labor
controversies . . . . [*Id.* at 71.]

The federal policy governing statements made dur-
ing the course of a grievance proceeding has been
clearly and repeatedly articulated.[6]

Other state courts that have addressed this issue
have divided on whether a qualified,[7] rather than
an absolute, privilege should be accorded to com-
munications made in the course of, or during,
grievance proceedings.[8]

---

[6] In *Joftes v Kaufman*, 324 F Supp 660, 662 (D DC, 1971), the court
stated the principle

"that notices of dismissal for cause which are contemplated by a
collective bargaining agreement and which are published by the
employer *only to those with a legitimate interest in the subject
matter* may not be made the subject of an action in libel, regardless
of whether the allegations of cause are true or false and regardless of
the actual motive behind the dismissal." (Emphasis added.)

[7] The difference is that complete protection is afforded by absolute
privilege, while a qualified or conditional privilege affords protection
only in the absence of ill motive or malice in fact. 50 Am Jur 2d,
Libel and Slander, § 192.

[8] The New Mexico Court of Appeals adopted the doctrine of abso-
lute immunity from liability for defamation during labor grievance
arbitration proceedings in *Neece v Kantu*, 84 NM 700, 706; 507 P2d
447 (1973), on the rationale that the procedure is a quasi-judicial
proceeding. Absolute immunity has consistently been accorded to
statements made in the course of judicial proceedings. The New
Mexico court quoted from a law review article discussing *Mendicki:*

"The grievance proceeding under a collective bargaining agreement
is quite similar to a judicial or quasi-judicial proceeding. The Supreme
Court has stated that the grievance procedure is 'an effort to erect a
system of industrial self-government' in which 'a new common law—
the common law of a particular industry or of a particular plant' is
fashioned and applied. The grievance procedure is merely an agreed-
upon substitute for legal action in a judicial forum and is actually
quasi-judicial in nature." Comment: The availability of defamation
remedies for statements made during the course of labor grievance-
arbitration proceedings, 15 Univ Kan L R 553, 561 (1967).

The District of Columbia Court of Appeals also found an absolute
privilege applicable to testimony of a witness in an arbitration
proceeding in *Sturdivant v Seaboard Service System, Ltd*, 459 A2d
1058, 1060 (DC App, 1983). The court explained that it favored an
absolute privilege because it

We choose to follow *Mendicki*[9] and accord an
absolute privilege to communications during griev-

"enables participants to state and support their positions without
instilling a fear of retaliation, *i.e.,* an action for damages . . . . To
deny an absolute privilege to witnesses, parties, arbiters and counsel
who participate in these proceedings, would chill the effect of the
[arbitration rules]. Clearly if parties in arbitration hearings were
given less protection than those in purely judicial proceedings, a
disincentive would be built into the system."

Accord *Brockman v Diesel Allison Div,* n 5 *supra* at 248, n 8, which
concludes that an absolute privilege should apply to statements made
at the grievance conference for the reasons stated in *Mendicki.*

In *Rougeau v Firestone Tire & Rubber Co,* 274 So 2d 454, 457, n 1
(La App, 1973), while the court's holding was based on the plaintiff's
failure to prove the defendant had published any defamatory state-
ment, the court similarly noted that "[e]ven if defendant [company]
did publish written accusations or did make oral accusatory state-
ments involving plaintiff [to union officials], they enjoy an unqualified
privilege which does not give rise to an action for damages."

Other states have accorded a qualified privilege to communications
made in the course of, and relevant to, a federal labor grievance
proceeding. In the leading case of *Bird v Meadow Gold Products Corp,*
60 Misc 2d 212; 302 NYS2d 701 (1969), a New York Supreme Court,
looking both to New York law and to other state court decisions
under the Railway Labor Act, held that statements made during
grievance proceedings are protected by a qualified privilege. *Bird* was
followed by the Alabama Supreme Court in *Dunning v Boyes,* 351 So
2d 883, 884 (Ala, 1977), *cert den* 436 US 917 (1978), where it was held
to be a jury question whether the qualified privilege was abused by
writing in a letter in connection with a grievance proceeding that the
employee was a "known Bigot." The Supreme Judicial Court of
Massachusetts also followed *Bird* in *Ezekiel v Jones Motor Co, Inc,*
374 Mass 382; 372 NE2d 1281 (1978). A former employee sought
damages for an allegedly slanderous statement made by a witness
during a hearing before a joint management-union grievance board to
the effect that the plaintiff had stolen a rod and reel from the
employer. The Supreme Judicial Court held that where the defen-
dants had a duty to communicate to the grievance board the reasons
for terminating the employee, they enjoyed a qualified privilege.

[9] The Court of Appeals, in *Merritt v Detroit Memorial Hospital,* 81
Mich App 279, 286; 265 NW2d 124 (1978), held that defamatory
statements about an employee to a union representative communi-
cated during grievance proceedings pursuant to a collective bargain-
ing agreement are absolutely privileged. The union representative
was acting "more or less as the agent of the plaintiff" and the
plaintiff never objected to his presence. The Court viewed Merritt's
action as the equivalent of consent and the communication was
therefore absolutely privileged. In contrast, publication of the reason
for Merritt's dismissal to supervisory personnel was qualifiedly privi-
leged.

ance proceedings because we are of the opinion that such protection is necessary to protect the process. The rationale is the same as underlies the absolute privilege that protects statements made during and germane to judicial proceedings.[10]

The potential for interference with the federal scheme of labor regulation is sufficient to "preempt" the interest of the state in protecting its citizens from defamatory statements during grievance proceedings.[11] The decision of the United States Supreme Court in *Linn v United Plant Guard Workers of America,* 383 US 53; 86 S Ct 657; 15 L Ed 2d 582 (1966), that the NLRA does not bar a civil action for libel under state law where the defamatory statements were published during a union organizing campaign by the union and its officers, is not controlling.

The basis of the discharges in the instant case, the accusation that the plaintiffs were dismissed because they stole sausage, was necessarily repeated in the grievance proceedings. A determination whether Fulghum and Morin were discharged for "just cause," as provided for in the collective bargaining agreement, could not be made without a consideration of the employer's reasons for the discharge. The exception recognized in *Linn* is inapposite.[12]

---

[10] See Prosser, Torts (4th ed), § 114, p 777.

[11] The general rule of preemption of state regulation of conduct actually or arguably prohibited as an unfair labor practice has two notable exceptions: "[W]here the activity regulated was a merely peripheral concern of the Labor Management Relations Act . . . [o]r where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *San Diego Building Trades Council v Garmon,* 359 US 236, 243-244; 79 S Ct 773; 3 L Ed 2d 775 (1959). See, generally, Gorman, Labor Law, Unionization & Collective Bargaining, ch XXXII.

[12] The Tenth Circuit reaffirmed *Mendicki* after the United States

In contrast to the recognized exceptions to federal preemption of state law,[13] a common-law ac-

---

Supreme Court's decisions in *Linn* and *Farmer v Carpenters,* 430 US 290; 97 S Ct 1056; 51 L Ed 2d 338 (1977). In *Hasten v Phillips Petroleum Co,* 640 F2d 274 (CA 10, 1981), *Linn* was distinguished in the language of *Mendicki:*

"The question in the *Linn* case was whether a libel action in the circumstances of that case 'might interfere with the national labor policy.' The question in the instant case is whether an action for damages on account of the statement upon which the instant case is predicated, made in a conference and bargaining session to adjust an employer's grievance, and which was clearly germane to the issue involved, would interfere with the national labor policy, and whether it is necessary to hold such statements unqualifiedly privileged to prevent impairment of that policy." 367 F2d 71-72.

*Linn* was also distinguished in *Brooks v Solomon,* 542 F Supp 1229, 1233 (ND Ala, 1982):

"In *Linn* exclusive jurisdiction was unsuccessfully sought on the basis of statements arguably made during the course of what the law forbids or discourages; an unfair labor practice. While the NLRB has jurisdiction over claims of unfair labor practice, there is no federal policy reason to shield the alleged libeler from a libel made during the course of an unfair labor practice. Here the statements were made during a proceeding which, rather than being discouraged by federal law, is encouraged by federal law; federal policy being to encourage the peaceful disposition of grievance issues. While the libelous statements considered in *Linn,* and the context in which they were uttered, constituted conduct which was merely a 'peripheral concern' of the NLRB, the circumstances giving rise to the action at bar involve interests which necessarily require the uniform employment of federal law in order to prevent the impairment of national labor policy."

The district court for the District of Columbia distinguished *Linn* in *Joftes v Kaufman,* 324 F Supp 660, 664 (D DC, 1971), where the employee brought a libel action for statements in the letters of notice of dismissal, saying:

"The rationale of the Court's decision [in *Linn*] was that the remedial provisions of labor law offered no possibility of relief for the injury allegedly suffered by the official . . . . Here, on the other hand, Joftes had available to him an opportunity through the grievance machinery to secure personal relief and vindication, and by way of an action for wrongful discharge if the grievance procedure were held not to be an exclusive remedy under the terms of the agreement. To allow him to proceed instead by way of a burdensome, expensive, vexatious libel suit against individuals who did no more than fulfill their duty to inform him of reasons for his discharge would indeed be subversive of procedures and remedies for employment disputes."

[13] The exceptions to federal preemption of state law involve actions that can be adjudicated without regard to the merits of the underlying labor controversy. Thus, in *Linn,* there was little risk that the

tion for defamation based on statements germane to the discharge of an employee during a grievance proceeding would directly and severely impair the functioning of the agreed-upon grievance procedure which has been repeatedly sustained by the United States Supreme Court.[14] Whatever deficiencies, if any, there may be in the Teamsters grievance procedure, it is the chosen mechanism under the collective bargaining agreement for the resolution of disputes. A rule of state law that would frustrate the efforts to adjust grievances through the process of collective bargaining would strike at the core of federal labor policy.

The alleged defamatory statements in the in-

state cause of action would interfere with the effective administration of national labor policy. The board's § 8 unfair labor practice proceeding would focus only on whether the statements were misleading or coercive; whether the statements also were defamatory would be of no relevance to the board's performance of its functions. Similarly, state court actions to redress injuries caused by violence or threats of violence are consistent with effective administration of the federal scheme. See, *e.g., United Construction Workers v Laburnum Construction Corp,* 347 US 656; 74 S Ct 833; 98 L Ed 1025 (1954); *Youngdahl v Rainfair, Inc,* 355 US 131; 78 S Ct 206; 2 L Ed 2d 151 (1957); *UAW v Russell,* 356 US 634; 78 S Ct 932; 2 L Ed 2d 1030 (1958). There is no risk that state damage actions will fetter the exercise of rights protected by the NLRA or procedures pursuant to the CBA governed by the NLRA. The Supreme Court's holding that the claim of intentional infliction of emotional distress based on the "outrageous conduct" of union officers consisting of "frequent public ridicule," "incessant verbal abuse," and refusals to refer him to jobs in accordance with the rules of the hiring hall could be brought in state court does not require that we apply state law in the instant case. See, *e.g., Farmer v Carpenters,* 430 US 290; 97 S Ct 1056; 51 L Ed 2d 338 (1977).

[14] In *Teamsters Local 174 v Lucas Flour Co,* 369 US 95, 104; 82 S Ct 571; 7 L Ed 2d 593 (1962), the United States Supreme Court recognized the importance of a single body of substantive law in the area embracing the adjustment of issues between employers and their employees by the peaceful process of conference and collective bargaining, and further said:

"The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy."

stant case, made within the limited confines of the grievance proceeding, are absolutely privileged. Ups, Mastay, and Shevrovich are absolutely privileged from a defamation action based on what they said, including accusations of dishonesty and theft, during the course of the grievance proceedings.

### III

Fulghum and Morin also allege that the defamatory accusations of dishonesty and theft were published and communicated to others. The record is sparse on these claims,[15] and Fulghum and Morin acknowledged during their deposition testimony that the circumstances in which the information about their discharge was communicated to others is unknown to them.

It is unrealistic to expect an employer and all of its employees to maintain confidentiality about the discharge of a coemployee where there is an ongoing grievance proceeding, so perfectly that word cannot get out. In many situations it will be difficult to determine the person—the discharged employee, the employer, or union representative—responsible for the information becoming known.

---

[15] Fulghum stated in his deposition:

"*A.* Well, one of the guys in the Over Goods Room asked me, 'What happened?' I said, 'What do you mean?' He said, 'We heard you got fired. For what?'

"*Q.* Did they tell you what they had heard?

"*A.* Yes.

"*Q.* What did they say?

"*A.* They said they heard that I got fired because of taking some sausage.

"*Q.* Did he tell you who told him that?

"*A.* No. They said they had heard."

Morin similarly testified:

"*Q.* Do you know of anyone who has told you that they were told by ups that you had been discharged for dishonesty?

"*A.* Well, the full-time people all knew it. I imagine word got around. I don't know how."

It is critical for a company like UPS—the essence of whose business is the careful transport of other people's goods—to have honest people in its employ. In the instant case, the employer has an interest in informing other UPS employees that discharge is the penalty for stealing even sausage. Further, the employees have an interest in knowing how the disciplinary process works in practice. In light of the ultimate holding of the joint committee, the plaintiffs were not damaged by any premature communication of the reason for discharge before its decision was rendered.

An employer is not privileged to communicate needlessly to the world at large, including fellow employees, the reason for discharge if it is of a character that would hold the discharged employee up to opprobrium. An employer does have a qualified privilege[16] to publish statements to other employees whose duties interest them in the subject. *Sias v General Motors Corp,* 372 Mich 542; 127 NW2d 357 (1964). In some situations there could be a genuine issue of material fact for the jury regarding a plaintiff's claim that the employer abused the qualified privilege through excessive publication of the defamatory statement or by proof that the defamatory statement was made with actual malice.

This Court has said that publication of the reason for discharging an employee to his coemploy-

_____

[16] "A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest. The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty." 50 Am Jur 2d, Libel & Slander, § 195, pp 698-699.

ees is outside of the qualified privilege. *Id.* In *Sias,* the employer told the fellow employees that the discharge of an employee in the protection department was for his misappropriation of company property—a charge that the jury found to be false. *Sias* and the cases following *Sias* are not controlling because there the publication was of a *false* statement.[17] In the instant case, the grievance proceedings implicitly determined, in upholding the discharge, that the communicated statement of dishonesty was true.

If an employee invokes the agreed-upon grievance procedure, the determination of an arbitrator or joint committee that the discharge was for "cause" establishes the defense of truth to a defamation action premised on statements which explain the reason for the discharge. To permit Fulghum and Morin to litigate the truth or falsity of the alleged defamatory statements would, again, be tantamount to allowing them to obtain a redetermination of the wrongfulness of their discharge.

We accept the determination of the joint committee for the limited purpose of deciding whether an employer's communications to his employees are outside of the qualified privilege because we are of the opinion that such effect should be given

---

[17] The Court said in *Sias:*

"On the question of the publication of the statement we hold that in calling in fellow employees of plaintiff and 'explaining' the circumstances of his separation, defendant corporation was serving its own particular interest. That interest, as described by defendant's representatives, was to restore morale in the plant protection force and to quiet rumors that were circulating among its members, adversely affecting the company. These men were not supervisors, personnel department representatives, or company officials. They were simply fellow employees in the identical work. No privilege extended to the communication to them and the trial court properly so held." *Id.* at 548.

Accord *Poledna v Bendix Aviation Corp,* 360 Mich 129, 141-142; 103 NW2d 789 (1960); *Tumbarella v The Kroger Co,* 85 Mich App 482, 493-494; 271 NW2d 284 (1978), *lv den* 406 Mich 939 (1979); *Haddad v Sears, Roebuck & Co,* 526 F2d 83, 85 (CA 6, 1975).

to the determination of an independent arbitrator or the joint committee. The United States Supreme Court has given the same effect to the resolution of a grievance when the parties' chosen instrument for resolving disputes is a joint committee as when it is to submit the matter to an independent arbitrator.[18] Recognizing the differences in process, we follow the lead of the United States Supreme Court in declining to draw a distinction.

## IV

In sum, the determination of an independent arbitrator, or of a joint committee, that a discharged employee was guilty of misconduct (and thus that there was cause for discharge) bars an action alleging conduct by the employer incidental to and directly related to the discharge and, in effect, that the employee was not guilty of misconduct[19] because the question whether he is guilty of misconduct has been decided adversely to the employee and may not be litigated in another form or forum.

WILLIAMS, C.J., concurred with LEVIN, J.

[18] See *General Drivers, Local 89 v Riss & Co,* 372 US 517; 83 S Ct 789; 9 L Ed 2d 918 (1963), holding that, as long as the determination of the grievance procedure is contractually final and binding, it is enforceable under § 301 in federal court and the court cannot reweigh the merits of the grievance. See also *Denver-Chicago Trucking Co, Inc v Kirk,* 132 NLRB 1416 (1961), in which the NLRB stated it will defer to the joint committee decision if the procedures adopted meet the standards that are applied to private arbitration as set forth in *Spielberg Mfg Co v Gruenberg,* 112 NLRB 1080, 1082 (1955):

"[T]he proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act."

[19] Where the discharged employee files a grievance, a claim that the employer's accusation of misconduct was communicated to other employees is based on employer conduct incidental and directly related to the discharge. A claim that an accusation of misconduct was defamatory alleges in effect that the employee was not guilty of misconduct.