Elizabeth SCUDERI, Plaintiff,

v.

MONUMENTAL LIFE INSURANCE
COMPANY, Defendant.

No. 03–CV–73662–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 9, 2004.

Julian P. Sugameli, and Michael J. Sugameli, Sugameli & Olson, Troy, MI, for plaintiff.

Jamie H. Nisidis, Braun Kendrick, Saginaw, MI, for defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This age discrimination/breach of employment contract action is presently before the Court on Defendant Monumental Life Insurance Company's Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion to which Response Defendant has replied. Having reviewed and considered the parties' briefs and supporting documents and the entire record of this matter, the Court has determined that oral argument is not necessary.[1] Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

### II. PERTINENT FACTS

Plaintiff Elizabeth Scuderi is a 48-year-old former employee of Defendant Monumental Life Insurance Company ("Monumental"). Ms. Scuderi worked for Monumental for 22 years until her termination on May 23, 2003.

At the time of her termination, Ms. Scuderi was a Senior Office Administrator in Monumental's Southfield, Michigan office. As a Senior Office Administrator, Ms. Scuderi supervised two less senior office administrators: Cristin Imbronone Costanza, an Intermediate Office Administrator in the Southfield office, and Sue Fern, a part-time office administrator in Monumental's Findlay, Ohio office. Ms. Scuderi reported directly to the District Manager Matthew Balsbaugh, who also worked in the Southfield office.

Throughout the course of her 22-year employment with Monumental, Ms. Scuderi received stellar performance reviews and with the exception of one incident in 1996, prior to the incident which led to her termination, she was never subject to any disciplinary action.[2]

---

1. The Court commends and thanks counsel for the thoroughness and clarity of their well-written briefs.

2. In 1996, before Matthew Balsbaugh became the District Manager in the Southfield office, Ms. Scuderi was reprimanded for "not fulfill-ing the responsibilities of her position" in connection with certain "inappropriate cash surrenders and misapplications of premium funds." [See Defendant's Ex. C.] Although Ms. Scuderi herself did not engage in the actual cash surrenders and misapplication of

In 1998, Monumental hired Cristin Imbronone (now "Costanza"), who was a close personal friend of Ms. Scuderi's daughter, Joanne. As indicated, Ms. Costanza worked under the immediate supervision of Plaintiff Scuderi and in the same office; their desks, in fact, were adjacent to one another. Ms. Costanza worked full-time for Monumental while attending Oakland University where she was pursuing a degree in Human Resources.

In her position as an Intermediate Office Administrator, Ms. Costanza qualified for Monumental's tuition reimbursement program which paid 100% of her college tuition on condition that she remain with Monumental for two years following her graduation. (If Ms. Costanza voluntarily terminated her employment sooner, she would be responsible for repayment of any tuition reimbursement paid by Monumental to that point.) Ms. Costanza graduated from Oakland University in December 2002 with a degree in Human Resources.

Notwithstanding that she would have to repay Monumental approximately $11,000 tuition, five months after graduating from college, on May 13, 2003, Ms. Costanza informed Mr. Balsbaugh that she was resigning from her position with Monumental to take a position as a Human Resources Assistant with Federal Mogul. [*See* Plaintiff's Dep., p. 47.] The Federal Mogul position paid $33,000 per year with comparable benefits to those at Monumental. This was approximately $4,500 more than she was earning at Monumental.

[*See* Costanza Aff., Defendant's Reply Brief, Ex. A.]

Mr. Balsbaugh told Ms. Costanza that he wanted the opportunity to try to keep her with Monumental. After consulting with the Home Office in Baltimore, Balsbaugh made at least two offers to Ms. Costanza. Costanza did not accept either offer because the offers were not financially equivalent to what Federal Mogul had offered her and because she wanted to work in Human Resources.

Accordingly, Monumental set out to fill Ms. Costanza's position. Mr. Balsbaugh and Plaintiff spoke about a number of candidates including Matt Balsbaugh's mother-in-law, Jill Greenman. Plaintiff was opposed to Ms. Greenman's candidacy and she stated so to a number of people in the office. [*See* Plaintiff's Dep. pp. 115–116.] Although Balsbaugh was later informed by his supervisor that he could not hire his mother-in-law, Plaintiff was not aware of this and, as of May 22, 2003, she thought that Jill Greenman was coming in for an interview that morning. *Id.* pp. 82–83.

Meanwhile, Plaintiff arranged for an interview on May 21, 2003 with Christina Frenczli, who was referred to Plaintiff by a friend of the family. *Id.* 58, 61. Part of Monumental's interview process is the administration of a pre-employment test called a "JEPS test," which Plaintiff had administered on a number of previous occasions. The JEPS test has three parts—language usage (which included spelling), comparing and checking, and reading com-

---

funds (a number of insurance representatives were the guilty parties), it was among Ms. Scuderi's responsibilities to monitor accounts and to report any improper account activities to management. Monumental reprimanded her for her failure to do so by suspending any salary increase to which she would have been entitled for one year and a copy of the letter of reprimand was placed in her personnel file.

*Id.* Although at her deposition, Ms. Scuderi testified that she felt that she was wrongly reprimanded, she admitted that she never objected to the reprimand at the time and never asked that she be permitted to have a letter explaining why she felt she was wronged placed in her file. *See* Plaintiff's Dep. pp. 110–11.

prehension. Each part of the test is separately timed. Plaintiff gave the test to Christina Frenczli

Ms. Scuderi testified that during the course of the test, she asked Ms. Frenczli how things were progressing and she responded that she was having a bit of trouble. [Plaintiff's Dep. pp. 67–68.] After Ms. Frenczli left, Plaintiff claims that she noticed that some of Ms. Frenczli's answers on the language usage part of the test were light in that the circles were not completely filled in.[3] Plaintiff then admittedly took it upon herself to fill in the circles of the answers more fully before overnighting the test to the Home Office for scoring. *Id.* 75–76.

Ms. Costanza whose desk was adjacent to Plaintiff's desk, saw Plaintiff not only marking with a pencil on the test but also using an eraser. [Costanza Dep. pp. 64–66.] Ms. Costanza also saw Plaintiff take a dictionary from a shelf and look up a word in the Outlook computer program, which was used in the Southfield office for spell-checking. *Id.* 73–74.[4]

After witnessing what appeared to Ms. Costanza to be Plaintiff's alteration of the JEPS test, Ms. Costanza spoke to Bill McCormick, a Sales Manager in the Southfield office, and told him that someone else should give the JEPS test to the next day's applicants. [Costanza Dep. p. 77; McCormick Dep. p 17.] Mr. McCormick asked Ms. Costanza why, but she would not answer and instead, just told McCormick to trust her; that it would be a good idea if someone else administered the test. *Id.* McCormick then demanded to know why, and Costanza finally told him what she had just witnessed. [Costanza Dep. p. 77; McCormick Dep. 17, 19, 21.]

Unaware of the day's events, Matt Balsbaugh and Plaintiff spoke on the telephone that evening and Mr. Balsbaugh informed Plaintiff that he heard that Helen Fiori, an Office Administrator in the Frankenmuth office who had formerly worked in the Southfield office, was interested in Cristin Costanza's position and that it was okay with him. Ms. Fiori is older than Plaintiff and, according to Plaintiff, it was Balsbaugh's idea to offer the position to Fiori. [Plaintiff's Dep. p. 118.]

Later that evening, Balsbaugh spoke with Bill McCormick, as is their usual practice. During the conversation, McCormick related to Balsbaugh what Cristin Costanza had witnessed regarding the JEPS test. Mr. Balsbaugh's response was to ask why Plaintiff would jeopardize her job by doing something like that and then stated that he was going to call Ms. Costanza. [McCormick Dep. pp. 20–21.]

Balsbaugh called Ms. Costanza at home. At first, she told Balsbaugh that she did

---

3. The job applicant fills in the answers on a "scantron"-like answer sheet. Because of the answer sheet form, both Plaintiff and Matt Balsbaugh believed that the tests were machine scored. Since the filing of the Complaint in this action, however, the parties have leared that the JEPS test is actually graded manually and not by machine.

4. Plaintiff claimed at her deposition that she was using the dictionary and Outlook on May 21, 2003 to look up how to spell the word "bipolar," which Matt Balsbaugh had used in a letter he had dictated to her earlier that day. [Plaintiff's Dep. pp. 79–80.] Plaintiff admitted that she did not type the letter that day but rather that she was looking up the word so that she could make notations on her shorthand for the next day. *Id.* Plaintiff, however, admitted that she never provided anyone at Monumental with this information, even after learning through her daughter, Joanne, what Cristin Costanza said she had witnessed. *Id.* at 94. According to Ms. Costanza, it would be unusual for Ms. Scuderi to use Outlook to check a single word as her normal practice would be to type an entire document then copy it into Outlook to conduct a spell check. [Costanza Dep. p. 31.]

not want to talk about it because of her close personal relationship with Plaintiff's daughter, Joanne. But, Balsbaugh demanded that she tell him what had occurred. [Costanza Dep. pp. 81–82.] Ms. Costanza then told Mr. Balsbaugh what she had witnessed:

> I told him that I saw her with her eraser out, using a pencil, making erasing marks and making marks with a pencil on the test. I told him that I saw her pick up the test and, like, read it, like I saw her looking at it, that she was looking at the dictionary, that she was looking up words on Outlook, and that's pretty much the gist of it, what I saw.

[Costanza Dep. p. 83.]

The following morning, May 22, 2003, Balsbaugh called Plaintiff into his office with his two Sales Managers, Bill McCormick and Roger Vinkemeier, as witnesses. He asked Ms. Scuderi if she had changed the answers on Christina Frenczli's test; Plaintiff responded, "no." Balsbaugh then said that he had a witness, and in response, Plaintiff then stated that all she had done was to darken in some of the circles that were light. [*See* Plaintiff's Dep. pp. 85–86.] Balsbaugh then informed Plaintiff that she was suspended, pending further investigation, and that she should give her keys to Roger Vinkemeier. *Id.* at 86.

After Plaintiff was sent home, Balsbaugh continued his investigation. He asked Cristin Costanza to prepare a written statement of what she had witnessed. [*See* Defendant's Ex. B.] Balsbaugh then contacted Lewis Johnson in the Home Office and asked Johnson to contact him when he received Ms. Frenczli's JEPS test and further asked Johnson if he could tell whether any of the answers had been erased. Johnson complied and after he received the test, informed Balsbaugh that there appeared to be a lot of erasing on

the grammar portion of the test. Balsbaugh then spoke with the applicant, Christina Frenczli, who was in the office again on May 22, 2003 for a follow up interview. She said that she had done some erasing on one part of the test.

Balsbaugh then spoke to Phil White, Vice President of Field Operations, regarding the situation. Balsbaugh told Mr. White he did not know what to do because of Plaintiff's many years of service and what he believed to be a spotless work record. [Balsbaugh Dep. p. 88.] Having reviewed Plaintiff's personnel file in the Home Office, White informed Balsbaugh that Plaintiff' record was not entirely spotless and told him about her 1996 reprimand. Balsbaugh then consulted with his supervisor, Steve Jecker.

After consulting with both Phil White and Steve Jecker, Balsbaugh decided to terminate Plaintiff's employment. He testified that he decided to terminate her because of her inappropriate alteration of the pre-employment test and because Plaintiff first denied doing so when he asked if she had altered the test in an way. [Balsbaugh Dep. pp. 53–56]. Balsbaugh said he relied upon the eyewitness statement of Ms. Costanza and upon Plaintiff's own statements during the meeting on May 22, 2003 when, after first denying altering the test, she admitted at least darkening in circles on the test. *Id.* [56–58, 98.] Balsbaugh testified that even if Plaintiff only filled in circles, he believed at the time that this could have changed the outcome of the test because both Plaintiff and Balsbaugh were of the belief that the test was graded by a machine. *Id.* 49, 51, 165. Balsbaugh testified that he also considered Plaintiff's possible motivation for altering Ms. Frenczli's test: First, Ms. Frenczli was a friend of a friend, and second, Plaintiff thought that Balsbaugh's mother-in-law was being considered for

the position and had made it known that she did not want her working there. [*Id.* 90, 95.]

On Friday, May 23, Balsbaugh called Plaintiff at home and informed her that she had the option of resigning or being terminated. Plaintiff said she would think about it and would call him back, which she did the following Tuesday, May 27, 2003.[5] She informed Balsbaugh then that she was not going to resign. Accordingly, Plaintiff was formally notified by letter dated May 27, 2003 that her employment was terminated.

After Plaintiff was terminated, Mr. Balsbaugh offered her Senior Office Administrator position to Cristin Costanza. Ms. Costanza then decided to forego the Human Resources position at Federal Mogul and accepted Balsbaugh's offer at a salary of $31,013.00, nearly $2,000 less than what she would have earned at Federal Mogul.[6]

Following the termination of Plaintiff's employment, Ms. Costanza had a conversation with her close friend, Joanne Scuderi, regarding the circumstances surrounding her mother's termination. Joanne asked Costanza how her mother could be terminated with a perfectly spotless record. [J. Scuderi Dep. p. 18; Costanza Dep. p. 90.] Ms. Costanza related her conversation with Joanne and Joanne's comment that her mother's record was spotless to Mr. Balsbaugh. In response, Balsbaugh stated that Plaintiff's record was not 'spotless.' [Costanza Dep., p. 90; Balsbaugh Dep. p. 139.] Costanza testified that Balsbaugh said nothing more than that to her about Mrs. Scuderi's record, but that she had already known that some problems had occurred in the office in 1996, so she herself drew the conclusion that any problems with Plaintiff's work record must have occurred in 1996. [Costanza Dep. pp. 90–91.] When subsequently speaking with Joanne Scuderi, Ms. Costanza refuted Joanne's prior statement about her mother and said that her record was not spotless and that something had occurred in 1996. [Costanza Dep., p. 91; J. Scuderi Dep. p. 18.] Costanza testified that in so doing, she was simply trying to help her friend understand what had just occurred with her mother. [Costanza Dep. p. 92.]

On June 3, 2003 and July 1, 2003, Plaintiff wrote to Monumental and requested a copy of her personnel file. Those letters were received by the Southfield Office and immediately forwarded to the Home Office in Baltimore. However, by the time Plaintiff's letters were received in Southfield, her personnel file had already been sent to Baltimore. (All personnel file requests are reviewed by Monumental's legal department in Baltimore.)

Defendant states that due to the press of business, Plaintiff's request for her file had simply not been processed as of the date Plaintiff filed her Complaint in this action (which was August 25, 2003). *See* Defendant's Ex. F, No. 11. Plaintiff's file was forwarded to her attorney on September 26, 2003. *See* Defendant's Ex. G.[7]

As noted, on August 25, 2003, Plaintiff filed her Complaint in the instant action in Oakland County Circuit Court. Defendant removed the action to this Court on September 23, 2004 on federal question

---

5. Monday, May 26, 2003 was Memorial Day.

6. Staying with Monumental also meant that Costanza would not have to pay back the $5,000 she would have had to have reimbursed the company for her college tuition if she had left the company.

7. Plaintiff does not dispute that the inter-office transfer of her file and letters occurred, only that the Court should not accept Defendant's explanation as an excuse for its failure to timely comply with the Bullard–Plawecki Act.

grounds. In her Complaint, Plaintiff alleges claims of age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the Michigan Elliott–Larsen Civil Rights Act. She also alleges Michigan common law claims of breach of employment contract and intentional infliction of emotional distress; and a claim of violation of the Michigan Bullard–Plawecki Right to Know Act. Discovery is now closed and Defendant has moved for summary judgment on all of Plaintiff's claims.

## III. *DISCUSSION*

### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[8] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for dis-

covery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least

---

**8.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful tri-

als." 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in this case.

B. *PLAINTIFF HAS FAILED TO MAKE OUT A LEGALLY COGNIZABLE CLAIM OF AGE DISCRIMINATION UNDER EITHER FEDERAL OR MICHIGAN LAW*

Plaintiff here has filed her claim of age discrimination under both the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and the Michigan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2202. Michigan courts frequently look to federal law when reviewing claims of age discrimination under the Elliott–Larsen Act. *See Radtke v. Everett,* 442 Mich. 368, 382, 501 N.W.2d 155 (1993); *Brocklehurst v. PPG Industries, Inc.,* 123 F.3d 890, 894 (6th Cir.1997). Thus, it is appropriate for this Court to consider both state and federal law in analyzing Plaintiff's discrimination claims in this action.

It is well-established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992); *Matras v. Amoco Oil Co.,* 424 Mich. 675, 683–84, 385 N.W.2d 586 (Mich.1986); *Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64 (1997); *Lytle v. Malady,* 456 Mich. 1, 566 N.W.2d 582, 595 (Mich.1997).

A plaintiff attempting to establish age discrimination may do so by producing either direct evidence of discrimination or by relying on the *McDonnell Douglas/Burdine* burden-shifting method. *Hedrick v. Western Reserve Care System,* 355 F.3d 444, 459 (6th Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 68, 160 L.Ed.2d 25 (2004); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 349 (6th Cir. 1998); *Hazle v. Ford Motor Co.,* 464 Mich. 456, 462, 628 N.W.2d 515, 520 (2001).[9] Plaintiff here has presented her age discrimination claims as one for "disparate treatment" using the *McDonnell Douglas/Burdine* framework.

Under the *McDonnell Douglas/Burdine* paradigm, a plaintiff can establish a *prima facie* case of age discrimination by showing that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination. *See Hedrick, supra; Ercegovich, supra; Matras v. Amoco Oil Co., supra,* 424 Mich. at 683–684, 385 N.W.2d 586; *Town v. Michigan Bell Telephone Co., supra; Lytle v. Malady (On Rehearing),* 458 Mich. 153, 172–73, 579 N.W.2d 906 (1998). It remains at all times the plaintiff's burden to establish by a preponderance of the evidence that her age was a "determining factor" in the decision to discharge her. *Matras, supra; Lytle, supra; Brocklehurst v. PPG Industries, Inc., supra; Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1023 (6th Cir.1993), *cert. denied,* 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993).

Monumental does not dispute that Plaintiff has established a *prima facie* case of age discrimination.

9. Plaintiff here concedes that she has no direct evidence of age discrimination.

■ Once the plaintiff has established a *prima facie* case, which creates a rebuttable presumption that the defendant unlawfully discriminated against the plaintiff, the burden of production of evidence shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action. *Burdine, supra,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *Hazle v. Ford Motor Co., supra,* 464 Mich. at 464–65, 628 N.W.2d at 521–22. If the defendant offers a legitimate reason, the burden of production shifts back to the plaintiff to demonstrate that the reason offered by the defendant was not its true reason but were a pretext for discrimination. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089; *Lytle, supra,* 579 N.W.2d at 915. However, despite the shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff. *Reeves, supra,* 530 U.S. at 143, 120 S.Ct. at 2106. *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

Monumental has rebutted Plaintiff's *prima facie* case by articulating a legitimate non-discriminatory reason for its decision to terminate Plaintiff's employment, i.e., Plaintiff's alteration of an applicant's JEPS test. Therefore, pursuant to *Burdine* and its progeny, the burden of production shifts back to Plaintiff to establish pretext.

### C. THE PLAINTIFF'S BURDEN AT THE PROOF–OF–PRETEXT STAGE DIFFERS UNDER FEDERAL AND STATE LAW

#### 1. MICHIGAN LAW

■ The Michigan Supreme Court clarified the plaintiff's burden in an Elliott–Larsen action at the proof-of-pretext stage in *Town v. Michigan Bell Telephone Co., supra:*

After the employer has met its burden of production, the employee must proceed without the benefit of the earlier presumption [created by the *McDonnell Douglas* prima facie case]. . . .

Once the presumption drops out of the case, the plaintiff retains the ultimate burden of proving discrimination. Plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that the discrimination was defendant's true motive in making the adverse employment decision.

**To prevail, the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge *and* that the plaintiff's age was a motivating factor in the employer's decision.** Thus, the employee must prove that the employer's explanation was a pretext for discrimination. The proofs offered in support of the prima facie case may be sufficient to create a triable issue of fact that the employer's stated reason is a pretext, as long as the evidence would enable a reasonable fact finder to infer that the employer's decision had a discriminatory basis. The strength of the prima facie case and the significance of the disbelieving pretext will vary from case to case depending on the circumstances. . . .

\*　　\*　　\*　　\*　　\*　　\*

[On an employer-brought motion for summary judgment,] we would hold that when viewed in a light most favorable to the plaintiff, the evidence must create a material issue of fact on which reasonable minds could conclude that the employer's stated reason is a pretext for

discrimination for summary judgment to be precluded. **Thus, plaintiff will not always present a triable issue of fact merely by rebutting the employer's stated reason(s); put differently, that there may be a triable question of falsity does not necessarily mean that there is a triable question of discrimination.**

568 N.W.2d at 68–69 (citations and punctuation omitted, and emphasis added). *See also, Lytle v. Malady, supra,* 566 N.W.2d at 597–98 ("For a plaintiff to survive summary disposition, he must always present an issue of fact regarding whether the defendant impermissibly discriminated. In some contexts, this may be shown merely by disproving the employer's articulated reason, **if, and only if, disproving the employer's reason also shows discrimination.**"); *Hazle v. Ford Motor Co., supra,* 464 Mich. at 465–66, 628 N.W.2d at 522 ("a plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for unlawful discrimination.")

In sum, as the Michigan Supreme Court emphasized in affirming the trial court's grant of summary disposition in *Town v. Michigan Bell,* "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." 568 N.W.2d at 69. *See also, Brocklehurst v. PPG, supra,* ("An age discrimination action is not 'a device which permits the jury to examine an employer's reason for discharge and determine that the employer's business judgment or policies do not appeal to its sensibilities.'" 123 F.3d at 898); *Dubey v. Stroh Brewery Co.,* 185 Mich.App. 561, 462 N.W.2d 758, 760 (1990) ("The soundness of an employer's business judgment, howev-

er, may not be questioned as a means of showing pretext.")

## 2. *FEDERAL LAW*

■ The federal standard regarding proof of pretext was delineated by the Supreme Court in *Reeves v. Sanderson Plumbing, supra.* Unlike the Michigan Supreme Court, the *Reeves* Court held that, while the fact-finder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not necessarily *compel* judgment for the plaintiff, it is nonetheless *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. The Court, therefore, concluded that it is not *always* necessary for a discrimination plaintiff to introduce independent evidence of discrimination in addition to establishing the falsity of the employer's articulated reason for its action. 530 U.S. at 148, 120 S.Ct. 2097. The Court explained:

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.... In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.... **Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false,** *may* **permit the trier of fact to conclude that the employer unlawfully discriminated.**

*Reeves, supra,* 530 U.S. 147–48, 120 S.Ct. 2097 (citations omitted and emphasis added.)

The Court, however, was careful to point out that such a showing may not be sufficient in every case:

> This is not to say that such a showing by plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination has occurred. . . .

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148–49, 120 S.Ct. 2097.

The Sixth Circuit revisited the question of what is a discrimination plaintiff's evidentiary burden at the pretext stage in light of *Reeves* in *Gray v. Toshiba Am. Consumer Prod.,* 263 F.3d 595 (6th Cir. 2001), and concluded in that case that *Reeves* bolstered the rebuttal framework established in *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1081 (6th Cir.1994). In *Gray,* the Sixth Circuit stated:

> This circuit . . . has held that "[t]he jury may not reject an employer's explanation [of its action] unless there is sufficient basis *in the evidence* for doing so." *Manzer,* 29 F.3d at 1083 (emphasis in original).

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.

*Id.* at 1084 (internal quotations and emphasis omitted). The first type of rebuttal, we said, consists of evidence that the reasons given by the employer simply did not happen. *Id.* The third type, "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* The first and third types of rebuttals, we held, "are direct attacks" on the credibility of the employer's proffered motivation for firing the plaintiff, and if shown, provide an evidentiary basis for what the Supreme Court has termed a "suspicion of mendacity." *Id.* It is thus clear, in light of *Reeves,* and *St. Mary's Honor Center,* as well as our opinion in *Manzer,* that whether the plaintiff has in fact presented evidence supporting each element of her prima facie case is material to the determination that the employer's articulated reason for the discharge is not credible.

Here, Toshiba articulated a non-discriminatory reason for firing Gray.... Gray, however, has produced no evidence casting doubt on the credibility of this articulated reason. Hence, there is no evidence that Toshiba's articulated reason has no basis in fact. Second, there is no evidence in the record that [the articulated reason] is not sufficient to warrant discharge under Toshiba's rules....

\* \* \* \* \* \*

That leaves only the second *Manzer* option—that the employer's articulated reason did not actually motivate the discharge. As to that type of rebuttal, we held,

> [i]f the bare bones elements of plaintiff's prima facie case were sufficient to make this showing, ... the entire 'burden shifting' analysis of *McDonnell Douglas* and its successors would be illusory... Accordingly, we hold that, in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence, but must, instead, introduce additional evidence of [prohibited] discrimination.

*Id.* Our holding is bolstered by the Supreme Court's conclusion in *Reeves* that "a plaintiff's prima facie cased, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097, 147 L.Ed.2d 105.

263 F.3d at 600–02.

Plaintiff here attempts to demonstrate pretext under all three of the above delineated options.

(a) *PLAINTIFF HAS FAILED TO ESTABLISH THAT DEFENDANT'S PROFFERED REASON HAD NO BASIS IN FACT*

■ As set forth above, one way to make a jury submissible case on the credibility of an employer's explanation is for the plaintiff to show by a preponderance of the evidence that the proffered reason had no basis in fact. The record evidence in this case, however, establishes that Monumental's proffered reason has a basis in fact. It is undisputed that Cristin Costanza informed Monumental's management that Plaintiff erased on the test and consulted a dictionary and the "Outlook" computer program while making marks and erasing on the test. Furthermore, Plaintiff admitted to Mr. Balsbaugh in May 2003, and admitted again at her deposition, that she darkened some of the circles on Ms. Frenczli's JEPS test. Based upon this information, Monumental had a factual basis to determine that Plaintiff inappropriately altered Ms. Frenczli's test.

Plaintiff, however, contends there is insufficient factual basis for Monumental's decision. She bases this contention on what she claims was a recanting by Ms. Costanza at her deposition of what she had reported to Monumental management in May 2003 about what she saw Ms. Scuderi doing with Ms. Frenczli's test. She claims that Ms. Costanza testified at her deposition that she did not see Ms. Scuderi change or erase any answers on Ms. Frenczli's test. Plaintiff's contention is not supported by the record evidence. Ms. Costanza testified quite emphatically that she saw Ms. Scuderi make erasures and markings on Ms. Frenczli's test.[10]

---

**10.** At her deposition, Ms. Costanza testified as follows:

 A [by Ms. Costanza]: Lisa had the tests on her desk with her pencil out and her eraser.

But even if, at her December 2003 deposition, Ms. Costanza had backed away from what she had reported to Monumental seven months earlier, the Sixth Circuit has adopted the "honest belief" rule with regard to an employer's proffered reason for discharging an employee:

> Under this rule, as long as an employer has an honest belief in the proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. *An employer has an honest belief in its reason for discharging an employee **where the employer relied on particularized facts that were before it at the time the decision was made.***

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir.2001) (citations omitted.) The particularized facts that were before Monumental at the time that Balsbaugh made the decision to terminate Plaintiff clearly establish that the reason given for terminating Plaintiff—i.e., alteration of Ms. Frenczli's JEPS test—has a basis in fact.

(b) *THE PROFFERED REASONS WERE SUFFICIENT TO MOTIVATE THE DISCHARGE*

■ There can similarly be no question that Plaintiff's alteration of an applicant's pre-employment test is sufficient to have motivated her discharge. As Mr. Balsbaugh testified, alteration of company documents is a violation of Monumental's work rules. [*See* Monumental Life's Policies and Procedures, § 6.5(7), Defendant's Ex. J.] Plaintiff argues, however, that other employees violated other rules listed in § 6.5 and were not terminated, and from this, Plaintiff concludes that her misconduct was not sufficient to motivate her discharge.

Analysis of the sufficiency of an employer's reason normally "consists of evidence

Q: Was that the only thing on Lisa's desk?
A: No, but it was the only thing in her work space. Like in front of her.

 \* \* \* \* \* \*

Q: Where was the eraser?
A: Laying, like there. On top of the test.
Q: The eraser was on the desk, okay. So, what else did you observe?
A: **I observed her making marks on the test and erasing on the test.**

 \* \* \* \* \* \*

Q: **You saw her erasing pencil marks?**
A: **Yes.**
Q: You're positive of that? You saw her erasing answers on the test?
A: I saw her erasing with the test open on her desk.... There was nothing else on top of her desk but the test open and an eraser, and she was erasing. I did not peer over and look at which number she was erasing or what exactly she was erasing, but as you can see, if you were to open any of these tests, the only thing there would be to erase are answers.
Q: How do you know she was erasing the test?

A: Because you can see the test, and you can see someone doing this.
Q: You're motioning with your hand?
A: I'm motioning with my hand. I sat from me to that paper, you know, not too far from her.
Q: That's about five or six feet?
A: Not even. Up to that paper.

 \* \* \* \* \* \*

Q: And did you have a clear view?
A: Yes.

 \* \* \* \* \* \*

Q: **So you observed her erasing something, and did you observe her marking something on the test?**
A: **Yes.**
Q: How many?
A: Maybe three, four....

 \* \* \* \* \* \*

Q: ... [Y]ou saw her darkening, you said about three or four?
A: To my recollection, yeah. Yes.
Q: And then how many times did she use the eraser?
A: Once or twice.
[Costanza Dep., pp. 64–67.]

that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer, supra,* 29 F.3d at 1084.

Plaintiff's "other employees violated other rules" argument in this case is insufficient to establish pretext. Plaintiff has not established that the misconduct of these other employees was substantially identical to the alteration of an applicant's pre-employment test. It is well-settled that

In order to show that an employer's proffered non discriminatory explanation is pretext on the grounds that a similarly situated employee received disparate treatment for the same conduct, "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all relevant aspects."

*Weigel v. Baptist Hospital of East Tennessee,* 302 F.3d 367, 378 (6th Cir.2002) (quoting *Ercegovich v. Goodyear Tire & Rubber Co., supra,* 154 F.3d at 352). *See also Mitchell v. Toledo Hospital, supra,* 964 F.2d at 583 (to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct as plaintiff).

Here Plaintiff attempts to compare her alteration of the employment test with violation of the company "no smoking" policy, prohibition of the use of "profanity or abusive language," and using alcohol on company property, all of which are listed in Section 6.5 of the Policy Manual as potentially dischargeable offenses. She posits only that because these violations emanate from the same manual they necessarily should be viewed as sufficiently similar to

support her pretext argument. This precise argument was made by the plaintiff in *Mitchell v. Toledo Hospital, supra* and rejected by both the district court and the Court of Appeals.

In *Mitchell,* the plaintiff was discharged for "misuse of company property," which was a terminable offense according to Toledo Hospital's employee handbook. *See* 964 F.2d at 580. She attempted to make out a pretext argument contending that one non-minority employee cursed at her team leader—also a terminable offense under the employee handbook—and another employee had a sufficiently poor attendance record to warrant discharge. *Id.* at 583. Mitchell's position, like the position of Plaintiff here, was that the conduct of these other employees was of "comparable seriousness" to the conduct for which she was fired. *Id.*

In affirming the district court's grant of summary judgment in favor of the defendant hospital, the Sixth Circuit held:

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated in *all respects.* Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating circumstances that would distinguish their conduct or the employer's treatment of them for it.

964 F.2d at 583 (emphasis in original; citations omitted.)

As *Mitchell* demonstrates, the argument of Plaintiff here is insufficient to establish that the reasons given by Monumental for

terminating her employment were not sufficient to motivate her discharge.

### (c) THE PROFFERED REASON ACTUALLY MOTIVATED DEFENDANT

■ That leaves only the second *Manzer* option—that the employer's articulated reason did not actually motivate the discharge; what actually motivated Plaintiff's employer was her age. As indicated above, "in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence, but must, instead, introduce additional evidence of [prohibited] discrimination." *Gray v. Toshiba Am. Consumer Prod. supra*, 263 F.3d at 601; *see also, Hedrick v. Western Reserve Care System, supra*, 355 F.3d at 460. As stated by the United States Supreme Court, "It is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc. supra*, 530 U.S. at 146–47, 120 S.Ct. 2097.[11]

Other than the evidence which establishes her *prima facie* claim, i.e., that she was replaced by a younger woman, Plaintiff's only purported additional evidence that her age was what actually motivated her employer's decision to terminated her employment is that twice in "general conversation"—i.e., once in March 2003 at her performance review and again in early May 2003—Mr. Balsbaugh asked Plaintiff what her plans were when her husband retired. *See* Plaintiff's Dep., pp. 45–47. Her specific testimony about the retirement conversations with Balsbaugh is as follows:

Q: [I]n your own words, what did he [Balsbaugh] ask you or say to you?

A [by Plaintiff]: He asked me what my plans were when my husband retired.

Q: Okay. And had you mentioned to him that your husband was planning to retire?

A: No.

Q: Okay. And at this point at least your husband's earliest retirement plans would be in three years?

A: Yes.

Q: And did you construe this to mean in three years when your husband retired?

A: Yes.

Q: And is it in fact your husband's plan to retire in three years or is he going to continue to work after his 30 years?

A: We don't know now right now.

Q: It was up in the air?

A: Yes.

Q: And when you say he [Balsbaugh] mentioned it in general conversation,

---

**11.** It is this "actually motivated" method of proving pretext that is most analogous to the method of proving pretext under Michigan law.

As the Sixth Circuit observed in *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427 (6th Cir. 2002), unlike federal law, Michigan law imposes a higher burden on plaintiffs after the employer has presented a legitimate, non-discriminatory reason for its employment actions. Specifically, Michigan law requires that the plaintiff show that the employer's stated reason is pretext for discrimination. *Id.* at 438. The *Hopson* court explained that under Michigan law:

[D]isproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for . . . discrimination.

*Hopson, supra* at 438–39, quoting *Lytle v. Malady, supra*, 458 Mich. 153, 579 N.W.2d 906, 916.

was that the context in which he first mentioned it?

A: Yes.

\* \* \* \* \* \*

Q: And [this] occurred when, if you recall?

A: I believe it was in March.

Q: And did he say anything more or different that time?

A: No.

Q: And what did you tell him each time?

A: I told him that I wasn't ready to leave Monumental, that I would be there a long time.

Q: And then you said he also mentioned it after Kristen [sic] announced that she was leaving?

A: Yes.

Plaintiff's Dep., pp. 45–47.

Mr. Balsbaugh testified that it is regular his practice to ask all of his management about their retirement plans in connection with their reviews. [See Balsbaugh Dep., p. 109; see also, McCormick Dep., p. 36]

Both federal and Michigan courts have held that questions about retirement plans are not evidence of age discrimination. As the Seventh Circuit explained in Colosi v. Electri–Flex Company, 965 F.2d 500, 502 (7th Cir.1992), "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." In Colosi, the plaintiff's boss twice asked when he was planning to retire and both times the plaintiff replied, "Never." The plaintiff asked the court to infer from these questions that the company thought he was too old to be working. 965 F.2d at 502. The court found that no such inference of age discrimination could be drawn from this evidence. Id. See also, Rowan v. Lockheed

Martin Energy Systems, Inc., 360 F.3d 544 (6th Cir.2004) (employer's concern about pending retirements is not the same as bias against age); Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998) (manager's question of how old the plaintiff was and when he planned to retire is a "textbook example of an isolated remark which demonstrates nothing"); see also Foster v. Bishop Int'l Airport Authority, 2003 WL 22092709 (Mich.App.2003) (unpublished) and Neff v. Petoskey Public Schools, 2003 WL 1698215 (Mich.App.2003) (unpublished) (both holding that asking about an employee's retirement plans is not evidence of age discrimination).

Furthermore, even assuming arguendo that Balsbaugh's questions concerning Plaintiff's retirement plans could be viewed as evidence of age discrimination, it is well-established that isolated, sporadic comments are insufficient to demonstrate discriminatory animus.

In Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325 (6th Cir.1994), the Sixth Circuit held that in age discrimination cases, statements allegedly showing an employer's age bias are to be evaluated by considering four factors:

(1) whether the statements were made by a decision-maker or by an agent within the scope of his employment;

(2) whether the statements were related to the decision-making process;

(3) whether the statements were more than merely vague, ambiguous or isolated remarks; and

(4) whether they were made proximate in time to the act of termination.

Id. at 1330. None of these factors is individually dispositive of age discrimination, but rather, they must be evaluated as a whole, taking all of the circumstances into account. Id.

Thus, the mere fact that purportedly age discriminatory comments were made by the plaintiff's supervisor at some point in time is not necessarily evidence of age bias in the decision-making process. Hence, a plaintiff's direct supervisor's comment that "[w]e don't necessarily like grey hair", although found to be more than a "stray remark", was held to be insufficient proof of age discriminatory pretext because the comment *"was uttered in an ambivalent manner and was not tied directly to [the plaintiff's] termination."* *Nesbit v. Pepsico, Inc.,* 994 F.2d 703, 705 (9th Cir.1993).

Similarly, in *Bolton v. Scrivner, Inc.,* 36 F.3d 939 (10th Cir.1994), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995), a supervisor's direct reference to the plaintiff as an "old fart" did not support a showing of pretext because the comments were isolated and no nexus was shown between the comments and the adverse employment decision. Therefore, the Tenth Circuit affirmed the district court's grant of summary judgment on the plaintiff's ADEA claim. *See also, Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir.1989) (plaintiff's supervisor's remark in reference to one of plaintiff's co-workers who was 62 years old that he did not want his office run by "little old Jewish ladies like his mother-in-law" held not to constitute direct evidence of age animus). As explained by the *Carter,* "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age" constitute evidence of age discrimination. *Id.*

The Sixth Circuit has adhered to the supervisor-plus-nexus-to-termination requirement in evaluating age discriminatory comments. Thus, in *Phelps v. Yale Security, Inc., supra,* the court upheld the district court's grant of judgment to the defendant-employer notwithstanding the verdict because the plaintiff's evidence of age animus consisted of evidence of two statements: (1) that her supervisor told her eight months before her termination that she had been transferred from a more responsible position because she was too old to continue at that prior secretarial position and (2) that a month later the supervisor told her that her fiftieth birthday "was a cause for concern." 986 F.2d at 1025. The appellate court found the comments to be "too abstract, in addition to being irrelevant and prejudicial" because the comments had been made nearly a year before her termination to have influenced the termination decision. 986 F.2d at 1025–26. In addition, the court regarded the comment about the plaintiff's birthday to be too ambiguous to establish any conclusive inferences. *Id.*

In *Gagne v. Northwestern National Insurance Co.,* 881 F.2d 309 (6th Cir.1989), the court affirmed summary judgment for the defendant-employer on the plaintiff's age discrimination claim which was predicated upon the alleged age animus of her supervisor evidenced by his comment that he "needed younger blood". *Id.* at 315–16.

The Court finds that under the facts and circumstances presented in the instant case, the comments of Matt Balsbaugh relied upon by Plaintiff do not rebut Monumental's legitimate non-discriminatory reason for Plaintiff's discharge. Importantly, other than the fact that these comments were made by Plaintiff's supervisor, Plaintiff presents no evidence that establishes a nexus between these stray comments and the employment action taken by Monumental against her. In short, Plaintiff has not established that what actually motivated her employer's decision to terminate her employment was her age.

For all of the foregoing reasons, the Court finds that Plaintiff has failed to establish a cognizable claim of age discrimi-

nation under either federal or Michigan law. Accordingly, the Defendant's Motion for Summary Judgment will be granted on Counts I and IV of Plaintiff's Complaint.

### D. *DEFENDANT'S ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIM*

Plaintiff's state law claim of breach of contract in Count II of her Complaint is based upon an alleged breach of the progressive disciplinary policy set forth in Monumental's employment handbook.

█ It is well-settled in Michigan that employment contracts for an indefinite term are presumptively terminable at the will of either party for any reason or for no reason at all. *Rood v. General Dynamics Corp.*, 444 Mich. 107, 116, 507 N.W.2d 591 (1993). To overcome the presumption of at-will employment, a plaintiff must present sufficient evidence to show either (1) that there was an express or implied agreement that her employment would only be terminated for just cause; or (2) that the employer's policies and procedures created a legitimate expectation that her employment would only be terminated for just cause. *Id.* at 117, 507 N.W.2d 591.

█ Plaintiff in this case does not allege that any oral statements of job security were made. Rather, she bases her claim entirely upon the progressive disciplinary policy contained within the employee handbook. [Plaintiff's Dep., pp. 112–13; Complaint ¶¶ 32–34]. Progressive disciplinary policies alone are insufficient to overcome the presumption of at-will employment. *Rood, supra.* In *Rood,* the Michigan Supreme Court rejected the argument that the employer's written policies and procedures—policies, as in this case, which specifically identified the types of misconduct that may result in discipline—evidenced a clear intention on the part of the employer

to create a just-cause employment relationship. *Rood,* 444 Mich. at 135–36, 507 N.W.2d 591. Similarly, in *Rowe v. Montgomery Ward & Co., Inc.,* 437 Mich. 627, 473 N.W.2d 268 (1991), the Michigan court found that a "Rules of Personal Conduct" sheet signed by the plaintiff when hired which set forth various types of conduct which could result in dismissal was not sufficient to establish a just cause employment relationship. *Rowe,* 437 Mich. at 644, 473 N.W.2d 268.

The corrective action policy contained within the Monumental employee handbook upon which Plaintiff here relies specifically states that

> Nothing, however, shall prevent the Company from terminating employment at any time, for any reason or for no reason, with or without advance notice, with or without imposing corrective action, or at any step in the corrective action process.

*See* Defendant's Ex. J., p. 6.3. The handbook further states that it "is not intended nor construed to be an employment contract," that "the Company may terminate your employment at any time, with or without cause, and with or without advance notice," and that "the policies, rules and regulations contained within the Company Policies do not constitute and are not intended to constitute an employment contract." *Id.,* pp. 1.1 and 2.1. Given these provisions, Plaintiff had no legitimate expectation of just cause employment. In fact, Plaintiff testified that she understood, based upon p. 2.1 of the employee manual, that she was an employee at will. *See* Plaintiff's Dep., pp. 30–31. Plaintiff also signed a number of documents acknowledging that her employment was at will. *See* Defendant's Ex. K. In particular, upon receipt of a copy of Monumental's Policies and Procedures, Plaintiff acknowledged

that "the Policies do not create or constitute an express or implied employment contract between the Company and me, nor do these policies guarantee any term of employment with the Company" and further acknowledged that "I may terminate my employment with the Company for any reason at any time, and that the Company may similarly terminate my employment for any reason and at any time." *See* Defendant's Ex. L. Such at-will acknowledgments have been held to be sufficient to negate an expectation of a just cause employment relationship, even where the plaintiff refused to sign the acknowledgment. *See Rowe, supra,* 437 Mich. at 651, 473 N.W.2d 268. As to each of these acknowledgments, Plaintiff testified that she read them and understood that she was an employee at will. *See* Plaintiff's Dep., pp. 26–29.

Based upon the foregoing undisputed evidence, the Court finds that Plaintiff cannot establish an implied contract or a legitimate expectation of just cause employment. Therefore, Defendant will be granted summary judgment on Count II of Plaintiff's Complaint.

E. *PLAINTIFF HAS NOT ESTABLISHED A LEGALLY COGNIZABLE CLAIM OF VIOLATION OF THE BULLARD–PLAWECKI RIGHT TO KNOW ACT*

 In Count III of her Complaint, Plaintiff alleges two claims predicated upon the Michigan Bullard–Plawecki Employee Right to Know Act, M.C.L. § 423.501 *et seq.*. First, she claims that Defendant violated sections 503 and 504 of the Act by failing to allow her to view, and failing to provide her with a copy of, her personnel file. She also claims a violation of Section 506 of the Act, which prohibits the employer's dissemination of disciplinary records to third parties.

1. *Plaintiff Was Provided With a Copy of her Personnel File*

M.C.L. § 432.503 provides that "[a]n employer, upon written request which describes the personnel record, shall provide the employee with an opportunity to periodically review... the employee's personnel record." The Act further provides that "[a]fter the review provided in [Section 503], an employee may obtain a copy of the information or part of the information contained in the employee's personnel record. M.C.L. § 423.504."

It is not disputed that Plaintiff requested a copy of her personnel file by letters dated June 3 and July 1, 2003, i.e., before this lawsuit was filed. *See* Defendant's Ex. E. It is further not disputed that Plaintiff sent these requests to Monumental's Southfield, Michigan office. However, before the Southfield office received these requests, Plaintiff's personnel file had already been transferred to the Home Office in Baltimore. Therefore, when Southfield received Plaintiff's requests for her personnel file, it forwarded the requests to the Home Office. Defendant states that due to the press of business, Plaintiff's request was not yet processed by the time that Plaintiff filed suit in August 25, 2003. *See* Defendant's Ex. F, No. 11. (Plaintiff filed suit less than three months after the first request.) It is undisputed that Plaintiff was provided with a copy of her personnel file on September 26, 2003. *See* Defendant's Ex. G.

The Bullard–Plawecki Act does not contain any specific time requirement for production of a copy of an employee's employment record and no Michigan state or federal case involving claims under the Act address the precise issue presented here, i.e., where an employer fully but tardily complies with the statute, with an unrebutted explanation for the delay, and provides

the employee's record within a month after Plaintiff initiated suit.

It is well-settled that statutory language should be construed reasonably, keeping in mind the purpose of the act. *See e.g., McManamon v. Redford Township,* 256 Mich.App. 603, 671 N.W.2d 56, 60 (2003), *app. denied,* 674 N.W.2d 154 (2003). In *Makohon v. DaimlerChrysler Corp.,* 2003 WL 22339225 (Mich.App.2003), the Michigan Court of Appeals determined that the purpose of Sections 503 and 504 of the Bullard–Plawecki Act is "to provide a method for ensuring that erroneous employment information that might harm an employee is corrected by providing employees an opportunity to review and dispute the information contained in their personnel files." *Id.* at * 7. *See also,* M.C.L. § 423.505 (delineating procedures for the removal or correction of information in an employee personnel record.)

Given this purpose and the absence of any time limit in the Act for an employer's compliance with an employee request for a copy of his/her personnel record, the Court finds that, where, as here, there is no evidence of willful withholding of an employee's file, delay alone in the production of a copy of the record is not a violation of the Act. This is particularly true in this case where Plaintiff has not alleged that her file contained any false or incorrect information, does not dispute the veracity of Monumental's explanation for the three-month delay in producing a copy of her file, and has not shown that she was prejudiced in any way by the delay.[12] *See Leonard v. Board of Governors of Wayne State University,* 2003 WL 1919530 (Mich. App.2003) (where defendant eventually

complied with the Act on its own prior to plaintiff's filing of his complaint and plaintiff could show no prejudice as a result of the delay, summary judgment properly granted to defendant on plaintiff's claim for damages under the Bullard–Plawecki Act). Plaintiff has neither alleged nor demonstrated that she would have done anything different had she been provided her personnel file sooner or that the delay had any impact on her lawsuit. Therefore, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's claim of violation of Sections 503 and 504 of the Bullard–Plawecki Act.

### 2. *Cristin Costanza Did Not Divulge a Disciplinary Report, Letter of Reprimand or Other Disciplinary Action*

■ The Bullard–Plawecki Act also provides that "[a]n employer shall not divulge a disciplinary report, letter of reprimand or other disciplinary action to a third party, [or] to a party who is not part of the employer's organization without written notice." M.C.L. § 423.506.

Plaintiff claims that Monumental is liable for violation of Section 506 of the Act as a result of Cristin Costanza's conversation with her close friend, Joanne Scuderi who is Plaintiff's daughter, after her mother's firing, in which she told Joanne that her mother "did not have a spotless record." The record evidence establishes that Joanne had asked Costanza how her mother could be terminated "with a perfectly spotless record." [J. Scuderi Dep. p. 18; Costanza Dep. p. 90.] Ms. Costanza subsequently related her conversation with Joanne and Joanne's comment that her

---

12. In fact, Plaintiff has not demonstrated that she was damaged in any way by the tardy production of her personnel file. Where as here there is no evidence of willful violation of the statute, the Act provides only for "actual damages" plus costs. *See* M.C.L.

§ 423.511(a). (It is only if a "willful and knowing" violation of the Act is established that the plaintiff is entitled to $200 statutory damages, plus costs *and* attorney's fees, and actual damages. *See* § 423.511(b).)

mother's record was spotless to Mr. Balsbaugh. In response, Balsbaugh stated that Plaintiff's record was not 'spotless.' [Costanza Dep., p. 90; Balsbaugh Dep. p. 139.] Costanza testified that Balsbaugh said nothing more than that to her about Mrs. Scuderi's record, but that she had already known that some problems had occurred in the office in 1996, so she herself drew the conclusion that any problems with Plaintiff's work record must have occurred in 1996. [Costanza Dep. pp. 90–91.] When subsequently speaking with Joanne Scuderi, Ms. Costanza refuted Joanne's prior statement about her mother and said that her record was not spotless and that something had occurred in 1996. [Costanza Dep., p. 91; J. Scuderi Dep. p. 18.]

There is no evidence of record to support Plaintiff's contention that Balsbaugh or Costanza "divulged a disciplinary report, letter of reprimand or other disciplinary action to" Joanne Scuderi. All that Balsbaugh told Costanza was that Plaintiff's record was not "spotless" and the record evidence is that Costanza herself drew the conclusion that something must have happened in 1996 when there were a number of problems at the Southfield office. Costanza had no knowledge of the contents of letter of reprimand issued to Plaintiff in 1996 and did not provide any information about the discipline to Joanne Scuderi. Therefore, no violation of the Act occurred. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of violation of Section 506.

## F. *PLAINTIFF HAS NOT ESTABLISHED A CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

■ The Michigan Supreme Court has never adopted the tort of intentional infliction of emotional distress into Michigan jurisprudence. *See Smith v. Calvary*

*Christian Church,* 462 Mich. 679, 686 n. 7, 614 N.W.2d 590, 593 n. 7 (2000); *Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 602, 374 N.W.2d 905, 907 (1985); *Khalifa v. Henry Ford Hospital,* 156 Mich.App. 485, 499, 401 N.W.2d 884, 890 (1987); *Andrews v. Prudential Securities, Inc.,* 160 F.3d 304, 309 (6th Cir.1998). However, the Michigan Court has described the standards that would have to be met for satisfaction of such a claim:

> The cases thus far decided have found liability only where the defendant's conduct had been extreme and outrageous. It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express

an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Roberts v. Auto–Owners, supra,* 422 Mich. at 602–603, 374 N.W.2d 905, *quoting* Restatement 2d of Torts, § 46, comment d.

Furthermore, both state and federal courts in Michigan have repeatedly held as a matter of law that the termination of an individual's employment is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress. *See Fulghum v. United Parcel Service, Inc.,* 424 Mich. 89, 96–98, 378 N.W.2d 472 (1985) (accusing plaintiffs of theft of company property and subsequently suspending then discharging them held insufficient to make out a claim of intentional infliction of emotional distress); *Stopczynski v. Ford Motor Co.,* 200 Mich.App. 190, 503 N.W.2d 912, 915 (1993); *Khalifa v. Henry Ford Hospital, supra; Kovacs v. Electronic Data Sys. Corp.,* 762 F.Supp. 161, 167 (E.D.Mich.1990), *aff'd,* 929 F.2d 701(6th Cir.1991); *Cole v. Knoll, Inc.,* 984 F.Supp. 1117, 1135 (W.D.Mich.1997); *Batchelor v. Sears, Roebuck and Co.,* 574 F.Supp. 1480, 1481–82 (E.D.Mich.1983).

As in the preceding cases, Plaintiff bases this cause of action on her termination of employment. As a matter of law, this is an insufficient basis for a claim for a claim of intentional infliction of emotional distress.[13]

## CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED in its entirety, with prejudice.

Let Judgment be entered accordingly.

---

**13.** Moreover, where, as here, an employment relationship is at-will, Defendant did no more than it was privileged to do, even if the conduct were to be deemed "outrageous." No claim for intentional infliction of emotional distress exists under such circumstances. *See Ledl v. Quik Pik Stores,* 133 Mich.App. 583, 591, 349 N.W.2d 529, 533 (1984) ("Since we have found that defendant had a legal right to terminate plaintiff's employment with or without cause..., we find that the trial court was correct in granting summary judgment to defendant on [the claim of intentional infliction of emotional distress].")